**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| **GREGGORY A. LYNN,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| vs. ) | Case No. 13-cv-596-GKF-TLW |
| ) | |
| **CAROLYN W. COLVIN,** ) | |
| **Acting Commissioner of Social Security,** ) | |
| ) | |
| **Defendant.** ) | |

## REPORT AND RECOMMENDATION

This matter is before the undersigned United States Magistrate Judge for a report and recommendation. Plaintiff Greggory A. Lynn seeks judicial review of the Commissioner of the Social Security Administration's decision finding that he is not disabled. As set forth below, the undersigned recommends that the Commissioner's decision denying benefits be **AFFIRMED**.

## INTRODUCTION

A claimant for disability benefits bears the burden of proving a disability. 42 U.S.C. § 423 (d)(5); 20 C.F.R. §§ 404.1512(a), 416.912(a). "Disabled" is defined under the Act as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To meet this burden, plaintiff must provide medical evidence of an impairment and the severity of that impairment during the time of his alleged disability. 20 C.F.R. §§ 404.1512(b), 416.912(b). A disability is a physical or mental impairment "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423 (d)(3). "A physical

impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [an individual's] statement of symptoms." 20 C.F.R. §§ 404.1508, 416.908. The evidence must come from "acceptable medical sources," such as licensed and certified psychologists and licensed physicians. 20 C.F.R. §§ 404.1513(a), 416.913(a). A plaintiff is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A).

Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. §§ 404.1520, 416.920; Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988) (setting forth the five steps in detail). "If a determination can be made at any of the steps that a plaintiff is or is not disabled, evaluation under a subsequent step is not necessary." Williams, 844 F.2d at 750.

In reviewing a decision of the Commissioner, the Court is limited to determining whether the Commissioner has applied the correct legal standards and whether the decision is supported by substantial evidence. See Grogan v. Barnhart, 399 F.3d 1257, 1261 (10th Cir. 2005). Substantial evidence is more than a scintilla but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. See id. The Court's review is based on the record, and the Court will "meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." Id. The Court may neither re-weigh the evidence nor substitute its judgment for that of the Commissioner. See Hackett v. Barnhart, 395 F.3d 1168, 1172 (10th Cir. 2005). Even if the Court might have reached a different conclusion, if

supported by substantial evidence, the Commissioner's decision stands. See White v. Barnhart, 287 F.3d 903, 908 (10th Cir. 2002).

## BACKGROUND

Plaintiff, then a 39-year old male, applied for Title II and Title XVI benefits on September 14, 2010. (R. 129-32, 133-37). Plaintiff alleged a disability onset date of June 30, 2007. (R. 129, 133). Because plaintiff's last date insured was June 30, 2007, at the ALJ hearing, plaintiff acknowledged that he was only eligible to apply for Title XVI benefits and amended his onset date to reflect his Title XVI application date. (R. 36-37, 138). Plaintiff claimed that he was unable to work due to heart issues, lower back pain, chronic knee pain, high blood pressure, diabetes, and high cholesterol. (R. 161). Plaintiff's claims for benefits were denied initially on November 18, 2010, and on reconsideration on March 3, 2011. (R. 59-72). Plaintiff then requested a hearing before an administrative law judge ("ALJ"), and the ALJ held the hearing on January 6, 2012. (R. 34-58). The ALJ issued a decision on February 21, 2012, denying benefits and finding plaintiff not disabled because he was able to perform other work. (R.16-33). The Appeals Council denied review after considering additional evidence, and plaintiff appealed. (R. 1-6; Dkt. 2).

**The ALJ's Decision**

The ALJ found that plaintiff had not engaged in substantial gainful activity since his alleged disability onset date.[1] (R. 21). The ALJ found that plaintiff had severe impairments of "degenerative disc disease of the lumbar spine status post surgery, diabetes mellitus, and hypertension. Id. Plaintiff's alleged impairment of diabetic retinopathy limited plaintiff's ability

---

[1] The ALJ identifies the onset date as July 29, 2010. (R. 21). This date appears to be a scrivener's error that combines plaintiff's date of birth (July 29) with the year of the application (2010). (R. 129-32). Plaintiff's applications for Title II and Title XVI benefits were filed on September 14, 2010, and plaintiff alleged a disability onset date of June 30, 2007, which he later amended to the application date. (R. 36-37, 129-32, 133-37).

to drive only at night, so the ALJ concluded that plaintiff's "vision would not interfere with ordinary work like activities." Id. The ALJ also determined that plaintiff's allegations of numbness in the fingers and memory issues were not supported by any medical evidence; therefore, the ALJ found these impairments to be medically nondeterminable. (R. 21-22). Plaintiff's impairments did not meet or medically equal a listing. (R. 22).

The ALJ then reviewed plaintiff's testimony and the medical evidence to determine plaintiff's residual functional capacity. (R. 23-28). Plaintiff testified that he regularly dropped things, especially anything heavier than a gallon of milk. (R. 23). Plaintiff also had "problems with buttons and pins." Id. He experienced pain when moving his neck up, down, left, and right. Id. He was in constant pain, which limited his ability to sleep more than one to three hours per night. Id. Plaintiff described a "sharp stabbing pain" that could last two to three days at a time. Id. Pain medication does not relieve the pain. Id.

Plaintiff occasionally drives during the day, but he has issues with his vision. Id. He complained of double vision and "shaking." Id. Reading glasses do not correct the problem. Id.

Plaintiff also has uncontrolled diabetes. Id. In previous years, plaintiff only took insulin shots when he could afford them, but he began taking them regularly the summer before the hearing. Id. Plaintiff is required to check his blood sugar level "all the time" and "at least three times a day" and needs six shots daily. Id. He stated that he cannot give himself the shots. Id.

Plaintiff's medical records indicated a history of low back pain and knee pain. Id. In 1995, he cracked a vertebra and underwent an L-5 laminectomy. Id. Plaintiff sought treatment for back pain in May 2009. (R. 25). X-rays showed "previous fusion of the lower lumbar spine, mild narrowing of the L3-L4 disc space, and no evidence of fractures. Id. Two weeks later, plaintiff again sought treatment at a different hospital for low back pain and was diagnosed with

sciatica. (R. 24). He complained again of back pain in July 2009 and was diagnosed with lumbosacral strain. Id.

Plaintiff received multiple "bilateral L-5 transforaminal epidural injection[s] with local anesthetic and steroid" between June 2009 and December 2009. Id. He also received a "bilateral L3-4 lumbar medial branch facet block with local anesthetic and steroid injection" in September 2009. Id. At a January 2010 examination, plaintiff was walking without an assistive device, was able to stand from a seated position with no difficulties, and had range of motion in both arms and legs. Id. The physician assessed plaintiff with "lumbar fusion syndrome, lumbar degenerative disc disease, and lower extremity radiculopathy." Id.

In April 2010, plaintiff sought treatment for low back pain sustained after moving a tool box. (R. 25). A week later, plaintiff sought treatment again at a different hospital. Id. Plaintiff reported that he lifted his tool box out of his truck and caused "something going 'out again' on his back." Id. He was diagnosed with "acute chronic flare-up of back pain." Id. A week after the second visit, plaintiff sought treatment at a third hospital. Id. This time, he "reported he hurt his back two days earlier lifting a toolbox" and complained that the pain radiated into his legs and knees. Id. In May 2010, plaintiff sought treatment at a fourth hospital "with complaints of back pain and chest pain after moving a toolbox in his truck." Id. One month later, plaintiff again sought treatment for back pain. Id. Plaintiff reported that he injured his back lifting a transmission. Id. X-rays showed "postoperative changes of the lumbar spine and multilevel endplate degenerative change noted." Id.

Plaintiff also sought pain management treatment. Id. In December 2010, he reported that his medication "worked great." Id. In March 2011, plaintiff "reported his medication was doing well overall and pain was well controlled." Id. Cold weather caused an increase in pain in

November 2011, but the medication was still working. Id. The following month plaintiff stated that his medication "was still working great." Id. Plaintiff also reported that the prescribed Xanax helped him sleep but that he could use a stronger dosage. Id.

With respect to his diabetes, plaintiff was hospitalized June 29-30, 2011, for "acute vision changes most likely secondary to severe hyperglycemia, and uncontrolled diabetes." Id. His vision issues resolved as his blood sugar levels decreased. Id. Plaintiff was hospitalized for four days in October 2011 for "acute pancreatitis of unknown etiology; type II diabetes mellitus requiring insulin with improved control, hypertension and chronic low back pain." Id. Plaintiff's abdominal pain faded, and his diabetes was treated with insulin. (R. 25-26). Plaintiff was prescribed Metformin again. (R. 26).

Plaintiff underwent a consultative examination in January 2009.[2] (R. 24). During the examination, plaintiff was able to pick up and manipulate paper clips without difficulty. Id. Plaintiff moved his legs well, but he had right knee pain with flexion and extension. Id. He also complained of pain in the right thigh with supine leg raising. Id. Plaintiff had full range of motion in his spine. Id. He also had "[i]ncreased sensation to tactile stimulation" in both feet. Id. The ALJ cited these findings with respect to plaintiff's gait:

> The claimant ambulated with an unstable gait favoring the left leg at a slow speed without the use of assistive device. While walking unassisted, his left foot strikes on the fore foot and the right knee remained extended. His right knee does not flex throughout the gait cycle, whether walking with or without his cane, which he prefers to hold in his right hand. He leans on his cane when ambulating.

Id. Plaintiff also had difficulty getting on and off the exam table. Id. The consultative examining physician assessed plaintiff with "poorly controlled diabetes mellitus type II; hypertension;

---

[2] This examination occurred more than a year before plaintiff's current application. The record indicates that plaintiff previously applied for Title II and/or Title XVI benefits, so this consultative examination may have been ordered in conjunction with one of plaintiff's previous applications. (R. 129, 138). Plaintiff has not objected to the use of this examination in his current application.

diabetic neuropathy; multiple joint pain most likely secondary to osteoarthritis, and lumbar back pain with history of L-5 laminectomy." Id.

Plaintiff also had a consultative examination to address his vision. Id. His corrected distant vision was 20/40 in the right eye and 20/30 in the left eye. Id. Near vision was 20/30 in both eyes. Id. Plaintiff had a normal field of vision. Id. The ophthalmologist diagnosed plaintiff with "trace nuclear sclerosis, background diabetic retinopathy" in both eyes. Id.

In addition to the consultative examination, two non-examining agency physicians reviewed plaintiff's medical records. In November 2010, the first physician found that plaintiff could perform light work with postural limitations. (R. 26). The second physician reviewed the records in March 2011 and concurred with the first physician's assessment. Id.

The ALJ gave great weight to both the consultative examining physicians and the non-examining agency physicians. (R. 28).

In assessing plaintiff's credibility, the ALJ relied on plaintiff's activities of daily living, the conservative course of treatment, and inconsistencies between plaintiff's complaints and the medical records. (R. 26-27). The ALJ noted that plaintiff had only received injections and pain management treatment following his back surgery. Id. The ALJ also noted that most of plaintiff's treatment records involved emergency room visits following heavy lifting activity. (R. 26). The ALJ also cited to function reports and medical records in which plaintiff reported being able to care for his personal needs and care for his children full-time. Id. Plaintiff also testified that he could see well enough to drive during the day. Id. Finally, the ALJ relied on plaintiff's x-rays, which showed some impairment, but nothing that would explain plaintiff's claims of disabling back pain, particularly in light of the medical records which showed plaintiff's medications worked well to control his pain. (R. 27).

The ALJ concluded that plaintiff retained the residual functional capacity to perform sedentary work with a limitation that he perform no work above shoulder level. (R. 22).

The ALJ found that plaintiff had no past relevant work. (R. 28). However, relying on the testimony of a vocational expert, the ALJ found that plaintiff could perform other work, such as a microfilm document preparer (300 jobs regionally/21,900 jobs nationally), a tube operator (200 jobs regionally/22,900 jobs nationally), and an addresser (200 jobs regionally/24,900 jobs nationally). (R. 29). Accordingly, the ALJ found plaintiff not disabled. Id.

**The ALJ Hearing**

The ALJ held the hearing on January 6, 2012. (R. 34-58). Plaintiff testified that he had not worked often in the last fifteen years. (R. 39). Plaintiff had "always tried to find a job," but when his wife was working, he stayed home with their five children. Id. He worked when they "could afford a babysitter." Id.

Plaintiff testified that he could sit for an hour before having pain in his back, knees, and feet. (R. 40-41). After sitting, plaintiff would lie down "for pretty much half the day" to relieve the pain. (R. 41). He complained that he could not do more than lie in bed and watch television due to pain. Id. Plaintiff testified that pain medication did not work. Id. Plaintiff's surgery had only increased his pain, but additional surgery might not help, and plaintiff could not afford surgery. (R. 42).

Plaintiff could only stand still for a few minutes at a time before experiencing dizziness. Id. After fifteen minutes, his feet would feel as though they were swelling, and plaintiff would have pain in his ankles, knees, low back, and neck. (R. 42-43). He could walk half a block, but not at a normal pace. Id. Plaintiff also could not bend over to pick up something from the floor. (R. 43-44).

Plaintiff complained of numbness and swelling in his fingers, limiting the use of his hands. (R. 44). He stated that he had these issues daily for "most of the day." Id. His wife filled out his paperwork because his handwriting was not legible. Id. He dropped things "all the time," and could not lift anything heavier than a gallon of milk without dropping it. (R. 44-45).

The pain in plaintiff's neck limited his ability to look left, right, up, and down. (R. 45). Plaintiff also could not bend over to put on his pants or tie his shoes. (R. 50). He had difficulty sleeping and did not find sleep aids effective. (R. 45-46). His pain medication only "takes the edge off. It just makes it a dull ache, but it still hurts." (R. 50). Plaintiff did not believe his pain was controlled enough to permit him to work. (R. 51).

Plaintiff's vision limited his ability to drive. (R. 46). He did not drive at night and was finding it difficult to see white and gray cars on sunny days. Id. Plaintiff stated that he had "double vision, blurriness," and "shaky feelings," as though someone were shaking the object he was trying to see. Id. He complained that his vision problems were constant but that glasses did not correct the problem. (R. 47).

Plaintiff alleged that his diabetes was still uncontrolled. He reported checking his blood sugar three to five times a day and taking insulin shots six times a day. (R. 48). Plaintiff stated that he could not give himself the shots. Id.

After plaintiff testified, the ALJ questioned the vocational expert. He posed a hypothetical in which plaintiff was limited to sedentary work with an additional limitation "to avoid work above shoulder level." (R. 53). The vocational expert testified that a claimant with those limitations could work as a microfilm document preparer, a tube operator, and an addresser. (R. 54).

The ALJ then asked the vocational expert to consider whether a person with the limitations plaintiff cited could perform any work. (R. 54). The vocational expert testified that plaintiff would not be able to work. Id.

Plaintiff's counsel also asked the vocational expert to consider an additional vision limitation in the ALJ's first hypothetical. Id. After clarifying that plaintiff was alleging double vision for more than one hour every day, the vocational expert testified that a visual limitation such as the one plaintiff described would prevent plaintiff from performing any work. (R. 54-57).

**Plaintiff's Medical Records**

The ALJ discussed plaintiff's medical records accurately and in great detail. Additional discussion of plaintiff's medical records is included *infra* as necessary to analyze plaintiff's allegations of error.

## ANALYSIS

On appeal, plaintiff raises three points of error: (1) that the Appeals Council failed to properly consider the newly submitted treating physician's opinion; (2) that the ALJ failed to consider all plaintiff's impairments and made improper findings at step five; and (3) that the ALJ failed to perform a proper credibility analysis. (Dkt. 17).

**Appeals Council Review**

Three days after the hearing, plaintiff's treating physician completed a residual functional capacity form. (R. 481-85). The Appeals Council added the form to the administrative record but denied plaintiff's request for review. (R. 1-6). Plaintiff argues that the Appeals Council was required to discuss the treating physician's opinion and could not simply deny review. (Dkt. 17). Alternatively, plaintiff argues that the treating physician's opinion should have been given controlling weight. Id. The Commissioner argues that the Appeals Council was not required to

explain its reasons for denying review, even after it accepted the new evidence. (Dkt. 18). The Commissioner also argues that, looking substantively at the treating physician's opinion, it is not entitled to any weight because it is inconsistent with the physician's treatment notes and plaintiff's statements about the efficacy of the pain medication. Id.

The Tenth Circuit does not require the Appeals Council to explain its reasons for denying review, even when new evidence is accepted. See Martinez v. Barnhart, 444 F.3d 1201, 1207-08 (10th Cir. 2006). In Martinez, the ALJ rejected an opinion from a treating physician because it conflicted with the other objective medical evidence and was not supported by any treatment notes. See id. at 1206-07. The claimant submitted the treatment records to the Appeals Council, and the Appeals Council made them part of the record without comment. See id. The Appeals Council then denied the claimant's request for review. See id. at 1204, 1207.

On appeal, the claimant argued that the Appeals Council was required to address the treatment notes and determine whether they "undercut the second ALJ's rejection of [the treating physician's] opinions." Id. at 1207. The Tenth Circuit disagreed, finding that the Appeals Council's standard language accepting the records but finding no basis to change the ALJ's decision constituted a sufficient review of the record, including the new evidence. See id. The Tenth Circuit rejected the claimant's argument "that the Appeals Council should have specifically discussed the effect of [the treating physician's] treatment records on the second ALJ's decision, in light of the record as a whole." Id. at 1208. The Court held that, "[w]hile an express analysis of the Appeals Council's determination would have been helpful for purposes of judicial review, [the claimant] points to nothing in the statutes or regulations that would require such an analysis where new evidence is submitted and the Appeals Council denies review." Id. at 1207-08. Because the treatment notes were considered new evidence, however, the Tenth Circuit

considered them in reviewing the claimant's argument that the treatment notes undercut the ALJ's finding that the treating physician's opinion was not supported by substantial evidence. Id. (citing O'Dell v. Shalala, 44 F.3d 855, 859 (10th Cir. 1994)).

In this case, the Appeals Council accepted the new evidence from plaintiff's treating physician and made it part of the record. (R. 5). The Appeals Council declined review, however, because the additional evidence did not render the ALJ's decision "contrary to the weight of the evidence." (R. 2). According to the ruling in Martinez, the Appeals Council was not required to explain its reasoning. See Martinez, 444 F.3d at 1207-08.

As the Tenth Circuit requires, however, the undersigned has reviewed the additional evidence as part of the administrative record to determine whether the ALJ's decision is supported by substantial evidence. See O'Dell, 44 F.3d at 859.

The new evidence, a residual functional capacity report from plaintiff's treating physician at the pain management clinic, states that plaintiff can sit for a total of two hours, stand for a total of one hour, and walk for ten to thirty minutes in an eight-hour work day. (R. 482). The treating physician also opined that plaintiff could lift and carry up to five pounds frequently and six to ten pounds occasionally. Id. Plaintiff also had limited ability to push/pull, grasp, bend, reach, handle, and finger. (R. 483). The treating physician explained that plaintiff had "severe ongoing pain" that rendered him "barely able" to perform activities of daily living. Id. The treating physician also explained that plaintiff took "multiple medications daily just to get out of bed," impacting his concentration, persistence, and pace. (R. 484). Plaintiff would also miss work more than three times a month because his medication caused "drowsiness and impairment of some form." Id.

In contrast, the medical records from the pain management clinic include progress reports from plaintiff and treatment notes from the treating physician. (R. 448-60). In November 2010,

plaintiff reported that he still had a good bit of pain but was able to control it by taking a double dose. (R. 460). The treating physician noted that plaintiff reported better functioning in his activities of daily living and observed that plaintiff's gait and ability to sit was improved. Id. The following month, plaintiff reported that the medication worked "great" but he ran out of medication three or four days before the appointment. (R. 459). Over the next year, plaintiff reported that the pain felt like a "dull hum" and that the medications were "working great." (R. 448-58). The treating physician reported similar findings, noting that plaintiff continued to have some lumbar pain. Id. In June 2011, plaintiff did complain of numbness in his feet after mowing the yard. (R. 453). He also complained once that Neurontin caused some agitation and shakiness. (R. 452). Otherwise, plaintiff reported no side effects and no instances of uncontrolled pain. (R. 448-60).

These records are consistent with the results of the consultative physical examination from Dr. Joel Hopper, which found that plaintiff had a slow unstable gait and some difficulty getting on and off the exam table but that plaintiff also had a normal range of motion in his neck and spine and negative results from the straight leg raise test. (R. 206-11). These records are also consistent with plaintiff's medical records from Tulsa Pain Consultants, which reflected his treatment with pain medication and epidural injections in 2009 and showed that plaintiff was able to walk without an assistive device, move all four extremities, and stand from a seated position without difficulty. (R. 217, 221, 227, 231).

In light of the consistent, objective medical evidence in the record, the undersigned finds that the new residual functional capacity report is not supported by substantial evidence and is insufficient evidence to overturn the ALJ's decision. Not only is the residual functional capacity

form inconsistent with the treating physician's own notes, it is also inconsistent with the other medical evidence in the record.

For these reasons, the undersigned recommends a finding of no error on this issue.

**Consideration of All Impairments and Step Five Findings**

Plaintiff also contends that the ALJ made a number of errors in evaluating plaintiff's impairments and that those errors resulted in improper findings at step five, when the ALJ found that plaintiff could perform other work. (Dkt. 17). Plaintiff argues that the ALJ should have found plaintiff's diabetic retinopathy/vision problems and numbness in his fingers to be medically determinable, if not severe, impairments that warranted the imposition of limitations in the residual functional capacity findings. Id. Plaintiff also argues that the ALJ should have included limitations for plaintiff's gait and limited range of motion in the right shoulder. Id. Finally, plaintiff contends that the number of jobs available is too low to qualify as a "significant number." Id.

The Commissioner argues that the ALJ discussed the limitations for plaintiff's diabetic retinopathy/vision problems but concluded, based on the objective evidence and plaintiff's own testimony, that the limitations would not impact plaintiff's work activities. (Dkt. 18). Plaintiff's complaints of numbness, however, were not supported by any medical evidence. Id. The Commissioner also argues that the ALJ's limitations to sedentary work and no work above shoulder level accommodate plaintiff's limitations. Id. Finally, the Commissioner argues that the number of jobs available meets the threshold for "significant numbers." Id.

**Diabetic Retinopathy**

The ALJ found that plaintiff's diabetic retinopathy was a medically nondeterminable impairment because plaintiff was "able to continue driving except at night, which indicates his

14

vision would not interfere with ordinary work like activities." (R. 21). The medical evidence shows that plaintiff underwent a consultative examination with an ophthalmologist. (R. 216). The ophthalmologist found that plaintiff had "background diabetic retinopathy" in both eyes, but plaintiff's corrected near vision was 20/30 in both eyes and plaintiff's corrected distance vision was 20/30 in the left eye and 20/40 in the right eye. Id. Nothing in the report indicates that plaintiff had issues with blurriness, double vision, or difficulty driving at night. Id. Plaintiff's testimony is the only evidence to support his claim that he could not drive at night. (R. 46).

**Numbness in the Hands**

Similarly, plaintiff's complaints of numbness in his hands are not supported by any medical evidence in the record. The consultative examining physician's report, which is the only objective medical evidence on this issue, indicates that plaintiff had normal range of motion in his wrists, hands, fingers, and thumbs. (R. 210-11). Plaintiff was able to manipulate small objects and grasp items with his hands. (R. 211).

**Blurriness and Double Vision**

The ALJ did not address plaintiff's complaints of blurriness and double vision. The medical records indicate that plaintiff complained of "acute visual changes" resulting from uncontrolled diabetes at the time of his one-day hospitalization in June 2011. (R. 429-34, 444). When plaintiff arrived at the hospital, he complained of blurred vision and a "kaleidoscope" effect on his vision. (R. 444). An examination revealed no abnormalities with plaintiff's corneas. (R. 442). The physician who examined plaintiff concluded that plaintiff's vision issues would resolve as his blood sugar levels normalized. (R. 444). Aside from this single incident, which was linked to plaintiff's diabetes, the only evidence of plaintiff's double vision and blurry vision is his own testimony. (R. 46-47).

The undersigned finds no error in the ALJ's failure to address plaintiff's blurriness and double vision. The regulations define an impairment as a condition that "must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 416.908. Further, to qualify as a severe impairment, "it must have lasted or must be expected to last for a continuous period of at least 12 months." 20 C.F.R. § 416.909. Plaintiff's complaints were a symptom of his uncontrolled diabetes, which the ALJ did find was a severe impairment. Plaintiff's vision changes, however, were not a separate impairment for a number of reasons. First, plaintiff had no physical abnormalities that would cause the symptoms of which he complained. Second, plaintiff's complaints of blurriness and double vision do not meet the duration requirement because the medical records indicate that plaintiff's vision issues were both "acute" and would resolve when plaintiff's diabetes was controlled. Accordingly, plaintiff's complaints of vision problems do not meet the definition of an impairment.

**Gait and Limited Range of Motion in the Right Shoulder**

The ALJ did address plaintiff's issues with gait and limited range of motion in the right shoulder. (R. 22). Limiting plaintiff to sedentary work accommodates plaintiff's pain and gait, which the ALJ acknowledged in his discussion of the medical evidence. (R. 24). Limiting plaintiff to work below the shoulder also accommodates plaintiff's limitations in the right shoulder, as evidenced by the notation that plaintiff's "right shoulder range of motion was impaired by pain." Id. These findings contradict plaintiff's claim that the ALJ made no accommodations for plaintiff's limitations in these areas.

**Other Work in "Significant Numbers"**

Plaintiff then argues that the ALJ failed to find other work in significant numbers that plaintiff could perform. The ALJ found that plaintiff could perform other work as a "micro film document preparer" (300 jobs regionally/21,900 jobs nationally); "tube operator" (200 jobs regionally/22,900 jobs nationally); and "addresser" (200 jobs regionally/24,900 jobs nationally). (R. 28). Plaintiff argues that 700 jobs regionally is insufficient to qualify as a "significant" number. (Dkt. 17).

In considering whether plaintiff could perform "other work," the ALJ was required to assess whether plaintiff could:

> Engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives *or* in several regions of the country.

42 U.S.C. § 423(d)(2)(A) (emphasis added). Under the statute, then, the ALJ may determine that jobs in "significant numbers" exist based on either the availability of work regionally or nationally. See Botello v. Astrue, 376 Fed.Appx. 847, 850-51 (10th Cir. 2010); Raymond v. Astrue, 356 Fed.Appx. 174, 178 n.2 (10th Cir. 2009) (unpublished).[3] The ALJ is not required to show whether such "[w]ork exists in the immediate area in which [plaintiff] live[s]." 20 C.F.R. §§ 404.1566(a)(1), 416.966(a)(1). While the number of jobs that qualify as other work in the region – 700 – seems relatively low for purposes of establishing a "significant number," the undersigned need not determine whether that number qualifies as a "significant number" because the number of jobs available nationally – 69,700 – is large enough. See Botello, 376 Fed.Appx.

---

[3] 10th Cir. R. 32.1 provides that "[u]npublished opinions are not precedential, but may be cited for their persuasive value."

at 851 (holding that reversal was not required when 67,250 jobs existed nationally and plaintiff had challenged only the number of regional jobs available); Prince v. Apfel, 149 F.3d 1191 (table), 1998 WL 317525) (10th Cir. 1998)) (finding that 20,000 jobs was sufficient to establish "significant numbers" of jobs available).

**Credbility**

Finally, plaintiff argues that the ALJ failed to perform a proper credibility analysis. (Dkt. 17). Plaintiff contends that the ALJ did not properly consider his limited activities of daily living, relied on boilerplate language in addressing other credibility factors, miscast the evidence, and failed to consider plaintiff's inability to afford treatment. Id.

This Court will not disturb an ALJ's credibility findings if they are supported by substantial evidence because "[c]redibility determinations are peculiarly the province of the finder of fact." Cowan v. Astrue, 552 F.3d 1182, 1190 (10th Cir. 2008) (citing Diaz v. Secretary of Health & Human Svcs., 898 F.2d 774, 777 (10th Cir. 1990)). Credibility findings "should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." Id. (citing Huston v. Bowen, 838 F.2d 1125, 1133 (10th Cir. 1988) (footnote omitted)). The ALJ may consider a number of factors in assessing a claimant's credibility, including "the levels of medication and their effectiveness, the extensiveness of the attempts . . . to obtain relief, the frequency of medical contacts, the nature of daily activities, subjective measures of credibility that are peculiarly within the judgment of the ALJ, . . . and the consistency or compatibility of nonmedical testimony with objective medical evidence." Kepler v. Chater, 68 F.3d 387, 391 (10th Cir. 1995).

The ALJ relied on a number of factors in assessing plaintiff's credibility. The ALJ discussed plaintiff's activities of daily living, noting that plaintiff reported an ability to care for

himself, to be a full-time caregiver for his children, handle finances, and drive during the day. (R. 26). The ALJ also noted, in reviewing plaintiff's conservative course of treatment, that plaintiff often sought treatment for back pain after lifting heavy objects, such as a toolbox or a transmission, another indicator that his activities were not as limited as plaintiff claimed. Id.

The ALJ discussed plaintiff's course of treatment. The ALJ cited plaintiff's use of emergency care rather than regular treatment. Id. The ALJ also relied on plaintiff's conservative course of care, namely the use of a pain management clinic to address plaintiff's back pain and epidural injections. (R. 26-27). The ALJ also noted that plaintiff's post-surgical x-rays did not reveal any disabling conditions and that pain medication was effective in controlling plaintiff's pain. (R. 27). Accordingly, plaintiff's complaints of disabling pain were not supported by the objective medical evidence.

The ALJ also found that plaintiff had not alleged any side effects from his medication. Id. As discussed *supra*, plaintiff did complain of side effects on one occasion, but otherwise, plaintiff stated that his medication was "working great." (R. 448-60).

These facts, discussed in the ALJ's opinion and supported by substantial evidence in the record, are more than sufficient to support the ALJ's finding that plaintiff was not entirely credible. Plaintiff's argument regarding credibility cites to a number of facts in the record, many of which the ALJ found were not supported by the evidence. (Dkt. 17). This argument, then, is nothing more than an attempt to persuade the Court to re-weigh the evidence. The undersigned finds no evidence that the ALJ miscast the evidence or ignored evidence that weighed in favor of plaintiff's credibility. For these reasons, the undersigned recommends a finding of no error on this issue.

## RECOMMENDATION

For the reasons set forth above, the undersigned **RECOMMENDS** that the Commissioner's decision be **AFFIRMED**.

## OBJECTION

In accordance with 28 U.S.C. §636(b) and Fed. R. Civ. P. 72(b)(2), a party may file specific written objections to this report and recommendation. Such specific written objections must be filed with the Clerk of the District Court for the Northern District of Oklahoma by February 24, 2015.

If specific written objections are timely filed, Fed. R. Civ. P. 72(b)(3) directs the district judge to determine *de novo* any part of the magistrate judge's disposition to which a party has properly objected. The district judge may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions. See also 28 U.S.C. § 636(b)(1). The Tenth Circuit has adopted a "firm waiver rule" which "provides that the failure to make timely objections to the magistrate's findings or recommendations waives appellate review of factual and legal questions." United States v. One Parcel of Real Property, 73 F.3d 1057, 1059 (10th Cir. 1996) (quoting Moore v. United States, 950 F.2d 656, 659 (10th Cir. 1991)). Only a timely specific objection will preserve an issue for *de novo* review by the district court or for appellate review.

SUBMITTED this 10th day of February, 2015.

_____
T. Lane Wilson
United States Magistrate Judge